UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO.:

JAMES D. SALLAH, not individually,
and solely in his capacity as
Court-Appointed Receiver,

      Plaintiff,

v.

LEO MILLER;
ESTATE OF CURTIS TANNEY;
TRIDENT TITLE, LLC;
REALTY PREMIER INC. D/B/A
EXIT REALTY PREMIER;
LIGIA TANNEY; AND
PNC BANK, N.A.

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, James D. Sallah ("Mr. Sallah", "Receiver", or "Plaintiff"), not individually, and

solely in his capacity as Court-Appointed Receiver for J.C.S. Enterprises, Inc., d/b/a J.C.S.

Enterprises Services, Inc. ("JCS"), T.B.T.I., Inc. ("TBTI"), My Gee Bo, Inc. ("My Gee Bo"), JOLA

Enterprise, Inc. ("JOLA"), PSCS Holdings, LLC ("PSCS"), and their affiliates, subsidiaries,

successors, and assigns (collectively referred to as the "Receivership Entities" and collectively

comprising the "Receivership Estate" ), by and through undersigned counsel, hereby sues Leo Miller

("Mr. Miller"), the Estate of Curtis Tanney, Trident Title, LLC ("Trident"), Realty Premier Inc. d/b/a

EXIT Realty Premier ("Exit Realty"), Ligia Tanney ("Ms. Tanney"), and PNC Bank, N.A. ("PNC

Bank"), (collectively referred to as the "Defendants"), and states, as follows:

## INTRODUCTION

1.      The United States District Court for the Southern District of Florida originally appointed Mr. Sallah as Receiver for JCS and TBTI by Amended Order Appointing Receiver dated April 7, 2014, subsequently expanded the Receivership over My Gee Bo by Order dated April 14, 2014, and thereafter expanded the Receivership over JOLA and PSCS by Order dated December 12, 2014 (collectively, the "Orders Appointing Receiver").[1]

2.      The Court entered the Orders Appointing Receiver in an enforcement action brought by the United States Securities and Exchange Commission (the "Commission" or "SEC") styled, Securities and Exchange Commission v. JCS Enterprises, Inc., *et al.*, Case No. 14-cv-80468-MIDDLEBROOKS (M.D. Fla.) (hereinafter referred the "SEC Proceeding").

3.      The Receiver was appointed pursuant to the Court's inherent equity powers to carry out the purposes of the SEC Proceeding, which was brought pursuant to Sections 5(a), 5(c), 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

4.      Under the Orders Appointing Receiver, to carry out the SEC's mandate, and to promote the purposes of the SEC Proceeding, the Receiver was directed, *inter alia*, to administer and manage the business affairs, funds, assets, choses in action, and any other property of the Receivership Entities; marshal and safeguard all of the assets; and take whatever actions necessary for the protection of the investors, including instituting legal proceedings against individuals or entities that have wrongfully or improperly received funds or other proceeds directly or indirectly traceable from investors in the hedge funds.

---

[1]*See* DE 19, 26, and 168.

5.    More specifically, the Court directed the Receiver to:

> Investigate the manner in which the affairs of JCS and T.B.T.I., were conducted and institute such actions and legal proceedings, for the benefit and on behalf of JCS and T.B.T.I., and their investors and other creditors, as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in JCS and T.B.T.I., including against JCS and T.B.T.I., their officers, directors, employees, affiliates, subsidiaries, or any persons acting in concert or participation with them, or against any transfers of money or other proceeds directly or indirectly traceable from investors in JCS and T.B.T.I.; provided such actions may include, but not be limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statute §726.101, et seq. or otherwise, rescission and restitution, the collection of debts, and such orders from this Court as may be necessary to enforce this Order.[2]

6.    The Receiver brings this action to recover from Defendants money that improperly was transferred from the Receivership Entities, and should be returned to the Receivership Entities.

**PARTIES**

7.    Mr. Sallah has brought this action in accordance with the Orders Appointing Receiver and is prosecuting this action, not in his individual capacity, but solely in his capacity as Court-Appointed Receiver for JCS, T.B.T.I., My Gee Bo, JOLA and PSCS.

8.    JCS is a Florida corporation with its principal place of business in Palm Beach County, Florida.

9.    TBTI is a Florida corporation with its principal place of business in Palm Beach County, Florida.

---

[2] *See* DE 19.

DIMOND KAPLAN & ROTHSTEIN, P.A.
OFFICES AT GRAND BAY PLAZA. 2665 SOUTH BAYSHORE DRIVE. PENTHOUSE 2B. MIAMI, FL 33133 · TEL. 305.374.1920 FAX. 305.374.1961

10.     My Gee Bo is a Florida corporation with its principal place of business in Palm Beach County, Florida.

11.     JOLA is a Florida corporation with its principal place of business in Palm Beach County, Florida.

12.     PSCS is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.  Both of PSCS's members are citizens of Florida and residents of Palm Beach County, Florida.

13.     Mr. Miller is a citizen of Florida and a resident of Palm Beach County, Florida.  At all times material hereto, Mr. Miller was a real estate agent with EXIT.

14.     Ms. Tanney is a citizen of Florida and a resident of Palm Beach County, Florida.

15.     At all times material, Mr. Miller and Ms. Tanney have been in a romantic relationship.[3]

16.     Trident is a Florida limited liability company, a title company and an escrow agent, with its principal place of business in Palm Beach County, Florida.

17.     Exit Realty is a Florida corporation and a real estate agency with its principal place of business in Palm Beach County, Florida.

18.     PNC Bank is a national bank with its principal place of business in Pittsburgh, Pennsylvania, but it maintains approximately 198 bank branches in the State of Florida, including several in Palm Beach County, Florida, and conducts business in Palm Beach County, Florida, and throughout the State of Florida, on a systematic and continuous basis, so that PNC Bank is subject to personal jurisdiction in the Southern District of Florida, pursuant to Fla. Stat. § 48.193.

---

[3]Indeed, in this very proceeding, Mr. Miller has provided sworn testimony stating that Ms. Tanney is his "life partner," that she is "his everything," and that they have lived together for almost ten (10) years. *See* Transcript of Show Cause Hearing (December 14, 2015), Page 28, Lines 1–2.

19.     Curtis Tanney, who is deceased, was the husband of Ms. Tanney. Ms. Tanney opened the Estate of Curtis Tanney in Palm Beach County, Florida, in September 2010.   The court administratively closed the Estate of Curtis Tanney on January 3, 2014.

### PERTINENT NON-PARTIES

20.     Paul Schumack ("Mr. Schumack") was the principal of TBTI, and resided in Palm Beach County, Florida, at all times relevant hereto.

21.     WCFS is a Florida corporation with its principal place of business in Boca Raton, Florida.

22.     Chad Wright ("Mr. Wright") resides in Palm Beach County, Florida, and is the president of WCFS.

23.     Mr. Wright is Mr. Schumack's step-son.

24.     On February 8, 2014, Ms. Tanney registered a fictitious name with the State of Florida for a sole proprietorship called Winners Choice Field Services.

25.     Kondaur Acquisitions LLC ("Kondaur") is an entity that Mr. Miller owns and controls.

### JURISDICTION AND VENUE

26.     The Court has subject matter jurisdiction over this case, pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 754, and 28 U.S.C. § 1367.

27.     This Complaint is brought to accomplish the objectives of the Orders Appointing Receiver, and thus this matter is ancillary to the Court's exclusive jurisdiction over the Receivership Estate.

28.     The Court has personal jurisdiction over Defendants, pursuant to 28 U.S.C. §§ 754 and 1692.

29.     Venue in this District is proper under 28 U.S.C. § 754, as this action is related to the SEC Proceeding pending in this District and the Receiver was appointed in this District.

### STANDING OF THE RECEIVER

30.     The Receiver owns all causes of action that belong to WCFS and Mr. Wright by virtue of valid Assignments of Claims executed by WCFS and Mr. Wright.[4]

### GENERAL FACTUAL ALLEGATIONS

31.     From at least 2011 through April 7, 2014, TBTI, which was controlled by Mr. Schumack, was a Ponzi scheme.

32.     At all times material, TBTI was insolvent.

33.     Mr. Schumack is a debtor under Fla. Stat. § 726.102(6); and the Receiver, on behalf of TBTI, is a creditor.

34.     In January 2014, Mr. Schumack caused TBTI to transfer over $1M to WCFS (and TBTI received nothing in return).

35.     WCFS was an insider, as defined by Fla. Sta. § 726.102(8).

36.     From the $1M that was transferred to WCFS, Mr. Schumack then orchestrated two subsequent transfers, each in the amount of $250,000.

### THE FIRST $250,000 TRANSFER

37.     In January 2014, Mr. Schumack caused WCFS to transfer $250,000 to Mr. Miller.[5]

_____

[4]*See, e.g.*, Assignment of Claims dated October 15, 2015, attached as **EXHIBIT A**.

[5]Mr. Miller claims that the transfer was for a short-term loan.  To date, however, Mr. Miller has not made payments on that alleged loan other than two (2) payments, purportedly in conjunction with that alleged loan, made to the Receiver, each in the amount of $3,000; one on May 31, 2014 and the other on July 18, 2014.

38.     On January 29, 2014, Mr. Miller deposited the $250,000 into his account held in the name of Kondaur.

39.     On January 30, 2014 – *i.e.,* the very next day – Mr. Miller caused Kondaur to make a check payable to the Estate of Curtis Tanney in the amount of $150,000.  With regard to the check made payable from Mr. Miller / Kondaur to the Estate of Curtis Tanney, it is noteworthy that:

      a.     Mr. Tanney was the late husband of Ms. Tanney – *i.e.,* Mr. Miller's love interest.

      b.     Neither Mr. Miller nor Kondaur is known to have had any business dealings or other relationship with Curtis Tanney.

      c.     At the time Mr. Miller caused Kondaur to make the check payable to the Estate of Curtis Tanney (which occurred on January 30, 2014), the Estate of Curtis Tanney already had been administratively closed (which occurred on January 3, 2014).

      d.     The check was deposited the same day that it was written – *i.e.,* January 30, 2014 – thereby indicating that it was not mailed, but rather written and then deposited that same day.

      e.     The check was deposited into an account at PNC Bank.

      f.     The check was ***not*** properly endorsed by a duly authorized representative of the Estate of Curtis Tanney.  (Indeed, there could have been no such endorsement because the Estate of Curtis Tanney already had been closed.)

      g.     Indeed, the check lacked any payee endorsement.

      h.     Yet, PNC Bank accepted the deposit, guaranteed it, and stamped the back of the check: "ABSENCE OF ENDORSEMENT GUARANTEED."

40.     With regard to the foregoing sum of $150,000 that was transferred from WCFS and ultimately deposited into the Estate of Curtis Tanney:

a.      WCFS has not received the return of any money from the Estate of Curtis Tanney; and

b.      WCFS has never received any benefit of from the Estate of Curtis Tanney.

### THE SECOND $250,000 TRANSFER

41.     On or about January 27, 2014, Mr. Schumack caused WCFS to purchase a cashier's check in the amount of $250,000 and made payable to Trident.

42.     Purportedly, those funds were to be used to permit WCFS to purchase a piece of real property located at 2234 Stotesbury Way, Wellington, Florida 33414 (the "Property").

43.     Trident was supposed to serve as the escrow agent for the transaction.

44.     Trident received the aforesaid $250,000 cashier's check on February 4, 2014, and confirmed that it was holding the deposit of $250,000 in escrow on February 19, 2014.

45.     Ultimately, the purported seller chose not to close the transaction and, therefore, the money properly should have been returned to WCFS.

46.     Indeed, on or about February 25, 2014, a representative of Exit Realty sent an e-mail to Trident with instructions that the funds it was holding in escrow should be returned to WCFS.

47.     Upon such request from Exit Realty, Trident dutifully instructed its bank to prepare a cashier's check, and its bank dutifully prepared a cashier's check in the amount of $250,000, made payable to WCFS.

48.     Exit Realty further represented that the "[a]gent is working to sell them another property and wants to hand deliver the check."

49.     The "agent" in question was Leo Miller.

a.      Leo Miller, however, was not working on behalf of WCFS.

b.      Rather, Leo Miller was endeavoring to steal from WCFS.

50.     In fact, neither Exit nor Trident ever received any written documentation whereby a duly authorized representative of WCFS authorized Trident to release the escrow funds to anyone other than a duly authorized representative of WCFS.

51.     Certainly, neither Exit nor Trident received any legitimate documentation (from a duly authorized representative of WCFS) authorizing the release of the escrowed funds (that should have been returned to WCFS) to Mr. Miller.

52.     Rather, on or about February 24, 2014, Mr. Miller forged Mr. Wright's signature on the Disbursement Authorization portion of the Escrow Deposit Form for Purchase with respect to the Property.

53.     Notwithstanding that Trident was not authorized to release the funds to Mr. Miller or  anyone else other than a duly authorized representative of WCFS, Trident improperly released the funds – *i.e.*, Trident improperly hand-delivered the cashier's check to Mr. Miller.

54.     In turn, Mr. Miller took the check intended for WCFS but, rather than deliver it to a duly authorized representative of WCFS, he gave it to his girlfriend, Ms. Tanney.

55.     Ms. Tanney then took the check made payable to WCFS and brought it to her bank *i.e.,* PNC Bank – for deposit.

56.     At that time, Ms. Tanney did not have any right, title, or interest in, or any legitimate relationship with, WCFS.

57.     But on or about February 8, 2014, Ms. Tanney registered a fictitious name, using the exact same initials as WCFS.  Specifically, she registered the fictitious name: "WINNERS CHOICE FIELD SERVICES."

58.     And just days later, on or about February 12, 2014, Ms. Tanney opened a business checking account at PNC Bank in the name of: "LIGIA E. TANNEY D/B/A WINNERS CHOICE FIELD

SERVICES."

59.     Just a few weeks later, on or about February 27, 2014, Ligia Tanney took the cashier's check that was made payable to WCFS and presented it for deposit into an account in which WCFS had no interest – *i.e.,* the account that she opened in the name of "Ligia E. Tanney d/b/a/ Winners Choice Field Services."

60.     The cashier's check was ***not*** properly endorsed by any duly authorized representative of WCFS.

61.     In fact, it was not endorsed by anyone.

62.     PNC Bank nevertheless deposited the cashier's check made payable to WCFS into the account Ms. Tanney opened in the name of "Ligia E. Tanney d/b/a/ Winners Choice Field Services."

63.     PNC Bank not only accepted the deposit, but also guaranteed it and stamped the back of the check: "ABSENCE OF ENDORSEMENT GUARANTEED."

64.     As a direct and proximate result of the foregoing, Ms. Tanney obtained full, free, and unrestricted access to the funds that properly should have been returned to WCFS but instead were deposited into the account that she opened in the name of "Ligia E. Tanney d/b/a/ Winners Choice Field Services."

65.     Once deposited into her account, Ms. Tanney spoiled certain of the funds and made further transfers to place the funds even further from the reach of WCFS. Specifically:

        a.     Upon information and belief, Ms. Tanney used the funds to write checks to cash;

        b.     Upon information and belief, Ms. Tanney used the funds to write checks to cover personal expenses;

c.      Upon information and belief, Ms. Tanney used the funds to write a check to a plastic surgeon (upon information and belief for the cost of cosmetic surgery for herself); and

d.      Ms. Tanney used the funds to write numerous checks made payable to Mr. Miller (*i.e.*, her boyfriend) in a combined amount not less than $27,000.

## COUNT I
### (CIVIL CONSPIRACY AGAINST MR. MILLER AND MS. TANNEY)
### (WITH REGARD TO *BOTH* $250,000 TRANSFERS)

66.      The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

67.      Mr. Miller and Ms. Tanney entered into a conspiracy together to steal and abscond with money belonging to WCFS (which originally came from TBTI).

68.      By means of deceit and fraud, Mr. Miller and Ms. Tanney illegally obtained and took possession of funds that should have been returned to WCFS.

a.      In one instance, Mr. Miller illegally obtained and took possession of $250,000 directly from WCFS, transferred $150,000 thereof Ms. Tanney (through the Estate of Curtis Tanney), and kept the balance for himself.

b.      In another instance, Mr. Miller and Ms. Tanney effectuated an elaborate scheme using a failed real-estate transaction to illegally obtain and take possession of $250,000 that was intended for WCFS.

i.      First, Mr. Miller illegally took possession of the cashier's check made payable to WCFS and unlawfully delivered it to Ms. Tanney.

ii.      Second, Ms. Tanney illegally took possession of the cashier's check and unlawfully deposited the funds that should have been returned to WCFS into her own account held in the name of "Ligia E. Tanney d/b/a Winners Choice Field Services."

iii.    Third, Mr. Miller and Ms. Tanney then used the funds for their own purposes, knowing full well that they had no legitimate claim to that money.

69.    As a direct and proximate result of the conspiracy between Mr. Miller and Ms. Tanney, and of their unlawful acts in furtherance of that conspiracy, WCFS sustained actual damages of $500,000, together with prejudgment interest.

70.    Mr. Miller and Ms. Tanney are jointly and severally liable for their acts done in furtherance of their conspiracy.

71.    The intentional misconduct perpetrated by Mr. Miller and Ms. Tanney in furtherance of their conspiracy subjects them to punitive damages.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendants, Mr. Miller and Ms. Tanney.

### COUNT II
(FRAUDULENT TRANSFER AGAINST MR. MILLER, PNC BANK, AND THE ESTATE OF CURTIS TANNEY)
(WITH REGARD TO THE *FIRST* $250,000 TRANSFER)

72.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

73.    At all times material, Mr. Schumack exercised control not only over TBTI, but also over WCFS.

74.    Mr. Schumack caused TBTI to transfer funds to WCFS totaling $1,000,000 such that WCFS owed a debt to TBTI.

75.    Thereafter, Mr. Schumack caused WCFS to transfer the sum of $250,000 to Mr. Miller.

a.    This transfer is fraudulent under **FLA. STAT. § 726.105(1)(A)** because the

transfer was made "with actual intend to hinder delay or defraud" creditors of WCFS (including TBTI).

      b.     This transfer is fraudulent under **FLA. STAT. § 726.105(1)(B)** because the transfer was made without "receiving a reasonably equivalent value in exchange for the transfer" and because:

            i.     WCFS "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" and

            ii.     Mr. Schumack intended WCFS "to incur . . . debts beyond [WCFS's] ability to pay as they became due.

      c.     This transfer is fraudulent under **FLA. STAT. § 726.106(1)** because WCFS "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolve as a result of the transfer or obligation."

      76.     Once in possession of the funds, Mr. Miller caused his company (*i.e., Kondaur*) to make a check payable to the Estate of Curtis Tanney, delivered it to Ms. Tanney, and Ms. Tanney presented the funds for deposit into a PNC Bank account held in the name of the Estate of Curtis Tanney.

      77.     Even though the check was not properly endorsed, PNC Bank accepted the deposit and provided its own guaranty.

      78.     As such, PNC Bank qualifies as an "initial transferee" of the fraudulently transferred funds.

DIMOND KAPLAN & ROTHSTEIN, P.A.

OFFICES AT GRAND BAY PLAZA. 2665 SOUTH BAYSHORE DRIVE. PENTHOUSE 2B. MIAMI, FL 33133 · TEL. 305.374.1920 FAX. 305.374.1961

79.     PNC Bank cannot avoid fraudulent transfer liability unless it can establish that it qualifies as a mere conduit, which requires that it establish, *inter alia,* that it did not have control over the funds and that it acted in good faith.

80.     PNC Bank cannot establish that it qualifies as a mere conduit because:

a.      By choosing to provide its own guaranty in the absence of a valid endorsement, PNC Bank had control over the funds; and

b.      PNC Bank cannot establish that it acted in good faith under the totality of the circumstances presented.

81.     Ultimately, the $150,000 was credited to the account held in the name of the Estate of Curtis Tanney.

82.     This transfer is fraudulent and may be set aside under **FLA. STAT. § 726.109(2)(B)** because the Estate of Curtis Tanney qualifies as a "subsequent transferee other than a good faith transferee who took for value."

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendants, Mr. Miller and the Estate of Curtis Tanney.

### COUNT III
(CONVERSION AGAINST MR. MILLER)
(WITH REGARD TO THE *FIRST* $250,000 TRANSFER)

83.     The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

84.     This is an action for actual damages of $250,000, exclusive of interest and costs.

85.     In January of 2014, Mr. Miller converted to his own use $250,000 which emanated from the Receivership Entities (to which those funds then belonged), and which was fraudulently

transferred to Mr. Miller directly from WCFS.

86.     Mr. Miller had actual and constructive knowledge that he had received that money by fraudulent transfer and unlawful means.

87.     Mr. Miller further had actual and constructive knowledge that he had no interest in that money at any time.

88.     Because of Mr. Miller's conversion of that money, Mr. Miller is liable for actual damages of $250,000, together with prejudgment interest, as well as punitive damages for Mr. Miller's intentional misconduct.

89.     It would be futile to demand that Mr. Miller return the funds to the Receiver, but multiple inquiries as to Mr. Miller's ability and willingness to return funds to the Receiver were nevertheless made to Mr. Miller's prior legal counsel without any response on behalf of Mr. Miller.

90.     The Receiver is entitled to recover from Mr. Miller actual and punitive damages.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, Mr. Miller.

### COUNT IV
#### (UNJUST ENRICHMENT AGAINST MR. MILLER)
#### (WITH REGARD TO THE *FIRST* $250,000 TRANSFER)

91.     The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

92.     WCFS directly conferred monetary benefits upon Mr. Miller of $250,000.

93.     Mr. Miller had knowledge of those monetary benefits and enjoyed them personally and through his conspiracy with Ms. Tanney.

94.     Mr. Miller accepted and retained those monetary benefits.

95.     The circumstances are such that it would be inequitable for Mr. Miller to retain those monetary benefits without reimbursing the Receiver for them.

96.     As a direct result of the foregoing, WCFS sustained losses of $250,000, together with prejudgment interest.

97.     Because of Mr. Miller's intentional misconduct with respect to the aforesaid funds emanating from the Receivership Entities, he is liable for punitive damages.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, Mr. Miller.

**COUNT V**
(CONVERSION AGAINST PNC BANK)
(WITH REGARD TO THE *FIRST* $250,000 TRANSFER)

98.     The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

99.     This is an action for actual damages of $150,000, exclusive of interest and costs.

100.    On or about January 30, 2014, PNC Bank took possession of a $150,000 check signed by Leo Miller and made payable to the Estate of Curtis Tanney.

101.    The aforesaid $150,000 check lacked the endorsement of a duly authorized representative of the Estate of Curtis Tanney, which had been administratively closed on or about January 3, 2014.

102.    In fact, the aforesaid $150,000 check lacked any payee endorsement.

103.    Nevertheless, PNC Bank guaranteed the aforesaid $150,000 check in the absence of any endorsement by a duly authorized representative of the Estate of Curtis Tanney.

104.    The money represented by the aforesaid $150,000 check emanated from the Receivership Entities through WCFS to Leo Miller.

105.    As a result, PNC Bank took possession of, and converted, funds that properly belonged to WCFS.

106.    Upon the Receiver's written demand, PNC Bank failed to return the funds in question.

107.    As a result of PNC Bank's conversion of the aforesaid $150,000 check, WCFS sustained actual damages of $150,000, together with prejudgment interest.

108.    PNC Bank's intentional and reckless misconduct in guaranteeing, accepting, negotiating and converting the aforesaid $150,000 check without endorsement make PNC Bank liable for punitive damages.

WHEREFORE, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, PNC Bank.

### COUNT VI
(FRAUDULENT TRANSFER AGAINST TRIDENT, PNC BANK, AND MS. TANNEY)
(WITH REGARD TO THE *SECOND* $250,000 TRANSFER)

109.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

110.    At all times material, Mr. Schumack exercised control not only over TBTI, but also over WCFS.

111.    Mr. Schumack caused TBTI to transfer funds to WCFS totaling $1,000,000.

a.    Those transfers are fraudulent under **FLA. STAT. § 726.105(1)(A)** because they were made "with actual intend to hinder delay or defraud" the Receivership Estate.

b.     Those transfers are fraudulent under **FLA. STAT. § 726.105(1)(B)** because they were made without "receiving a reasonably equivalent value in exchange for the transfer" and because:

i.     the Receivership Estate "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" and

ii.     Mr. Schumack intended the Receivership Estate "to incur . . . debts beyond [its] ability to pay as they became due.

c.     Those transfers are fraudulent under **FLA. STAT. § 726.106(1)** because the Receivership Estate "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolve as a result of the transfer or obligation."

112.    Thereafter, $250,000 of the funds fraudulently transferred to WCFS were transferred to Trident, where they were to be held in escrow.

113.    As such, Trident qualifies as an "initial transferee" of the fraudulently transferred funds.

114.    Trident cannot avoid fraudulent transfer liability unless it can establish that it qualifies as a mere conduit, which requires that it establish, *inter alia*, that it acted in good faith.

115.    Trident cannot establish that it acted in good faith because:

a.     It failed to verify the signature of its client (*i.e.,* Trident allowed Mr. Miller to forge the signature of a duly authorized representative of WCFS); and

b.     Rather than entrust possession of the cashier's check representing the funds that should have been returned to WCFS, Trident improperly entrusted possession of the cashier's

check to Mr. Miller.

116.    From there, Mr. Miller delivered the cashier's check to Ms. Tanney, who deposited the funds into her account at PNC Bank in the name of "Ligia E. Tanney d/b/a Winners Choice Field Services."

117.    Even though the check was not properly endorsed, PNC Bank accepted the deposit and provided its own guaranty.

118.    As such, PNC Bank also qualifies as an "initial transferee" of the fraudulently transferred funds.

119.    PNC Bank cannot avoid fraudulent transfer liability unless it can establish it qualifies as a mere conduit, which requires that it establish, *inter alia*, that it did not have control over the funds and that it acted in good faith.

120.    PNC Bank cannot establish that it qualifies as a mere conduit because:

    a.      By providing its own guaranty, PNC Bank had control over the funds; and

    b.      PNC Bank cannot establish that it acted in good faith under the totality of the circumstances presented.

121.    From there, the funds were deposited into the account of Ms. Tanney.

122.    This transfer is fraudulent and may be set aside under **FLA. STAT. § 726.109(2)(B)** because Ms. Tanney qualifies as a "subsequent transferee other than a good faith transferee who took for value."

    **WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendants, Trident, PNC Bank and Ms. Tanney.

## COUNT VII
### (FORGERY AGAINST MR. MILLER)
### (WITH REGARD TO THE *SECOND* $250,000 TRANSFER)

123.　　The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

124.　　On or about February 24, 2014, Mr. Miller was not authorized to sign documents as a representative of WCFS.

125.　　Nevertheless, Mr. Miller forged Mr. Wright's signature on the Disbursement Authorization portion of the Escrow Deposit Form for Purchase with respect to the property located at 2234 Stotesbury Way, Wellington, Florida 33414 – thereby purporting to authorize the refund of $250,000 to WCFS.

126.　　Mr. Miller made that forgery with intent to injure and/or defraud WCFS.

127.　　The instrument on which Mr. Miller forged Mr. Wright's signature had legal efficacy.

128.　　The effect of Mr. Miller's forgery of Mr. Wright's signature was to cause Trident to release the escrow funds of $250,000, which should have been refunded to WCFS but, in fact, wound up in the possession of Ms. Tanney.

129.　　As a direct and proximate result of Mr. Miller's forgery of Mr. Wright's signature, WCFS sustained damages of $250,000, together with prejudgment interest.

130.　　Because of his intentional misconduct in forging Mr. Wright's signature, Mr. Miller is liable for punitive damages.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, Mr. Miller.

## COUNT VIII
### (CONVERSION AGAINST MS. TANNEY)
### (WITH REGARD TO THE *SECOND* $250,000 TRANSFER)

131.    The Receiver re-alleges each and every allegation contained in paragraphs 1 through 65, as if set forth herein verbatim.

132.    This is an action for actual damages of $250,000, exclusive of interest and costs.

133.    On or about February 27, 2014, Ms. Tanney took funds that properly belonged to WCFS and converted them to her own use by depositing them into the account that she opened in the name of "Ligia E. Tanney d/b/a Winners Choice Field Services" at PNC Bank.

134.    Because of Ms. Tanney's conversion of WCFS's property, WCFS sustained actual damages of $250,000, together with prejudgment interest.

135.    Because of Ms. Tanney's intentional misconduct, Ms. Tanney is liable for punitive damages.

136.    Upon the Receiver's written demand, Ms. Tanney failed to return the funds represented by the aforesaid $250,000 check to the Receiver.

WHEREFORE, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, Ms. Tanney.

## COUNT IX
### (NEGLIGENT SUPERVISION AGAINST EXIT)
### (WITH REGARD TO THE *SECOND* $250,000 TRANSFER)

137.    The Receiver re-alleges each and every allegation contained in paragraphs 1 through 65, as if set forth herein verbatim.

138.    At all times relevant hereto, Mr. Miller was a real estate agent with Exit Realty.

139.    At all times relevant hereto, Mr. Miller worked for Exit Realty, and Exit Realty

employed Mr. Miller as a real estate agent.

140.    Exit Realty owed a duty of care to WCFS to supervise Mr. Miller as a real estate agent within Exit Realty's employ, and specifically with respect to the real estate deal on the property located at 2234 Stotesbury Way, Wellington, Florida 33414.

141.    Exit Realty negligently and recklessly breached its duty to supervise Mr. Miller.

142.    Exit Realty negligently and recklessly failed to supervise Mr. Miller by permitting him to use Exit Realty's instrumentalities to:

      a.    forge the signature of a duly authorized representative of WCFS; and

      b.    unlawfully take possession of the cashier's check that should have been delivered to a duly authorized representative of WCFS.

143.    As a direct and proximate result of Exit Realty's negligent and reckless failure to supervise Mr. Miller, WCFS sustained actual damages of $250,000, together with prejudgment interest.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, Exit Realty.

**COUNT X**
(NEGLIGENCE AGAINST TRIDENT)
(WITH REGARD TO THE *SECOND* $250,000 TRANSFER)

144.    The Receiver re-alleges each and every allegation contained in paragraphs 1 through 65, as if set forth herein verbatim.

145.    In agreeing to serve as the escrow agent for the transaction involving the property located at 2234 Stotesbury Way, Wellington, Florida 33414, in which WCFS was the purchaser who paid funds into escrow, Trident undertook a duty of care to WCFS to effectuate faithfully the duties

of an escrow agent.

146.    Trident breached its duty of care to WCFS by:

a.    Negligently failing to verify a signature and thereby permitting Mr. Miller effectively to forge the signature of a duly authorized representative of WCFS, purportedly justifying the release of the funds in escrow.

b.    Negligently delivering a cashier's check made payable to WCFS, which should have been delivered only to a duly authorized representative of WCFS, to Mr. Miller.

147.    As a direct and proximate result of Trident's aforesaid breach of duty, WCFS sustained actual damages of $250,000, together with prejudgment interest.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, Trident.

### COUNT XI
#### (BREACH OF FIDUCIARY DUTY AGAINST TRIDENT)
#### (WITH REGARD TO THE *SECOND* $250,000 TRANSFER)

148.    The Receiver re-alleges each and every allegation contained in paragraphs 1 through 65, as if set forth herein verbatim.

149.    In agreeing to serve as the escrow agent for the transaction involving the property located at 2234 Stotesbury Way, Wellington, Florida 33414, in which WCFS was the purchaser who paid funds into escrow, Trident undertook a duty of care to WCFS to effectuate faithfully the duties of an escrow agent.

150.    Trident breached its duty of care to WCFS by:

a.    Negligently failing to verify a signature and thereby permitting Mr. Miller effectively to forge the signature of a duly authorized representative of WCFS, purportedly justifying

the release of the funds in escrow.

        b.     Negligently delivering a cashier's check made payable to WCFS, which should have been delivered only to a duly authorized representative of WCFS, to Mr. Miller.

151.    As a direct and proximate result of Trident's aforesaid breach of duty, WCFS sustained actual damages of $250,000, together with prejudgment interest.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, Trident.

### COUNT XII
### (CONVERSION AGAINST PNC BANK)
### (WITH REGARD TO THE *SECOND* $250,000 TRANSFER)

152.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 65, as if set forth herein verbatim.

153.    This is an action for actual damages of $250,000, exclusive of interest and costs.

154.    On or about February 27, 2014, PNC Bank took possession of a cashier's check made payable to WCFS.

155.    The aforesaid $250,000 check lacked the endorsement of WCFS.

156.    In fact, the aforesaid $250,000 check lacked any payee endorsement

157.    Nevertheless, PNC Bank guaranteed the aforesaid $250,000 cashier's check in the absence of any endorsement by WCFS.

158.    As a result, PNC Bank took possession of, and converted, funds that properly belonged to WCFS.

159.    Upon the Receiver's written demand, PNC Bank failed to return the funds in question.

160.    As a result of PNC Bank's conversion of the aforesaid $250,000 cashier's check, WCFS sustained actual damages of $250,000, together with prejudgment interest.

161.    PNC Bank's intentional and reckless misconduct in guaranteeing, accepting, negotiating and converting the aforesaid $250,000 check without endorsement make PNC Bank liable for punitive damages.

**WHEREFORE**, Plaintiff demands judgment for actual, compensatory and punitive damages, including prejudgment and post-judgment interest, as well as the costs of this action, against Defendant, PNC Bank.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable as a matter of right.

DATED:        July 11, 2016.

Respectfully submitted,

By:    s/ David A. Rothstein
       David A. Rothstein, Esq.
       Fla. Bar No.: 56881
       David@dkrpa.com
       Christopher M. Drury, Esq.
       Fla. Bar No.: 796751
       Cdrury@dkrpa.com

DIMOND KAPLAN & ROTHSTEIN, P.A.
2665 South Bayshore Drive, PH-2B
Miami, Florida 33133
Telephone: (305) 374-1920
*Attorneys for Plaintiff*